UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| NATHAN HINKLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:17-CV-97-TLS |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

The Plaintiff, Nathan Hinkle, seeks review of the final decision of the Commissioner of the Social Security Administration (Commissioner) denying his applications for disability and disability insurance benefits as well as supplemental security income. The Plaintiff argues that the Commissioner wrongfully denied his applications and erred by improperly weighing his treating physician's opinion, "playing doctor," and failing to incorporate all medically determinable limitations into the Plaintiff's residual functional capacity.

**BACKGROUND**

On December 12, 2012, the Plaintiff filed his fifth Title II application for a period of disability and disability insurance benefits. (R. 11.) He also filed a Title XVI application for supplemental security income on October 26, 2012. (*Id.*) The Plaintiff later amended his applications to reflect an alleged onset date of August 11, 2012, which was one day after the denial of his previous claims. (*Id.*) His claims were denied initially on September 10, 2013, and upon reconsideration on October 2, 2013. (*Id.*) On April 21, 2015, the Plaintiff appeared with

counsel and testified at a hearing before an administrative law judge (ALJ). (*Id.*) Sharon D. Ringenberg, a vocational expert, also appeared and testified at the hearing. (*Id.*) On July 21, 2015, the ALJ denied the Plaintiff's applications, finding he was not disabled from his alleged onset date. (R. 11–30.) On January 12, 2017, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the Plaintiff's request for review of the ALJ's decision. (R. 1–3.)

On March 15, 2017, the Plaintiff filed this claim [ECF No. 1] in federal court against the Acting Commissioner of the Social Security Administration.

## THE ALJ'S FINDINGS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but also any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. § 423(d)(2)(A).

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits. 20 C.F.R. § 404.1520. The first step is to determine whether the claimant no longer engages in substantial gainful activity (SGA). *Id.* In the case at hand, the ALJ found that the Plaintiff has been unable to engage in SGA since his alleged disability onset date, August 11, 2012. (R. 14.)

In step two, the ALJ determines whether the claimant has a severe impairment limiting his ability to do basic work activities under § 404.1520(c). In this case, the ALJ determined that

the Plaintiff had multiple severe impairments, including levoscoliotic curvature, chronic obstructive pulmonary disease with allergic rhinitis and history of partial lung resection, attention-deficit/hyperactivity disorder, depressive disorder NOS (not otherwise specified), and bipolar disorder (NOS). (*Id.*) ALJ found that these impairments caused more than minimal limitations in the Plaintiff's ability to perform the basic mental and physical demands of work and had lasted for at least twelve months as required under the statute. (*Id.*) The ALJ also found that the Plaintiff had medically determinable, but non-severe, impairments, including asthma/COPD with exertional dyspnea, status post right thoracotomy with right lung surgery, removal of benign tumor by history, "history a little unclear," history of chest wall pain secondary to thoracotomy and pneumonia. (*Id.*) The ALJ found that the Plaintiff's complaint of dyslexia was not a medically determinable impairment. (R. 14–15.)

Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of the [the] listings in appendix 1 . . . ." § 404.1520(a)(4)(iii). If a claimant's impairment(s), considered singly or in combination with other impairments, rise to this level, there is a presumption of disability "without considering [the claimant's] age, education, and work experience." § 404.1520(d). But, if the impairment(s), either singly or in combination, fall short, the ALJ must proceed to step four and examine the claimant's "residual functional capacity" (RFC)—the types of things he can still do physically, despite his limitations—to determine whether he can perform "past relevant work," § 404.1520(a)(4)(iv), or whether the claimant can "make an adjustment to other work" given the claimant's "age, education, and work experience." § 404.1520(a)(4)(v).

The ALJ determined that the Plaintiff's impairments did not meet or equal any of the listings in Appendix 1 and that he had an RFC involving the following limitations:

3

> Sitting six hours out of an eight hour workday; standing and/or walking two hours out of an eight hour workday; lifting carrying, pushing and pulling 10 pounds frequently and 10 pounds occasionally; occasional kneeling, crouching, crawling and balancing; occasional squatting; frequent, but not constant, reaching; frequent, but not constant, fingering, feeling, gripping and fine manipulation of small objects; frequent, but not constant, gross manipulation, handling, grasping, turning and gripping of larger objects; no climbing of ropes, ladders or scaffolds; occasional use of ramps and stairs one to two flights at a time; occasional bending and stooping in addition to what is required to sit; no work involving extreme amounts of dusts, gases and fumes and no work requiring contact with chemicals or cleaners and no work to be performed outside; the claimant is limited to work that involves simple, routine and repetitive tasks that can be learned with a short demonstration or up to within 30 days-best learned with visual or hands on demonstration; the claimant can maintain the concentration required to perform simple tasks; he can remember simple work like procedures; he can read a simple sentence and read a short list and address labels; he is limited to "low stress" jobs, defined as jobs requiring only occasional decision making and only occasional changes in the work setting; he can tolerate predictable changes in the work setting; he can meet production requirements in an environment that allows for a flexible and goal oriented pace; he can make simple work related decisions; he is limited from fast paced work such as assembly line production work with rigid or strict productivity requirements; he can have no work with the public and he is limited to superficial interaction with coworkers and supervisors, with "superficial" defined as occasional and casual contact, not involving prolonged conversation, notwithstanding that contact with supervisors could still involve necessary instruction, prolonged conversation is not necessary for task completion.

(R. 18.)

After analyzing the record, the ALJ concluded that the Plaintiff was not disabled from his alleged onset date to his date last insured. The ALJ evaluated the objective medical evidence and the Plaintiff's subjective symptoms and found that the Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but only "to some extent." (R. 20.) In so finding, the ALJ determined that the Plaintiff's "representations, concerning the intensity, persistence, and limiting effects of the symptoms alleged, are not generally credible, because they are not generally consistent with the evidence taken as a whole . . . ." (*Id.*) In making this credibility determination, the ALJ considered several factors including that the instant application was the Plaintiff's fifth application for benefits (R. 11), that the

4

Plaintiff's alleged onset date was only a single day after the final denial of his previous claim for benefits (*Id.*), discrepancies in the Plaintiff's statements and reports to his physicians (R. 16, 28), evidence of activities inconsistent with total disability such as an emergency room visit for an injury sustained by working on a car at which his hands were observed to be "pretty callused from doing a lot of physical work and a little bit of chronic staining from grease, oil, etc." (R. 24), absence of muscle atrophy that would be consistent with a sedentary lifestyle (R. 26), and his non-compliance with medical recommendations such as the cessation of smoking (*Id.*).

In looking to the objective medical evidence, the ALJ gave no evidentiary weight to consultative physician Dr. Bacchus's opinion regarding the Plaintiff's alleged dyslexia because such conclusion was outside the scope of Dr. Bacchus's expertise and because it was "not generally consistent with the evidence overall." (R. 14–15.) The ALJ accorded significant evidentiary weight to consultative psychologists Drs. Shipley and Larsen concerning the "paragraph C" criteria, the Plaintiff's activities of daily living, and episodes of decompensation because their opinions were "generally consistent with the evidence overall but accorded little evidentiary weight to their opinions concerning social functioning, and concentration, persistence or pace because their opinions were "not generally consistent with the evidence overall . . . ." (R. 17.) The ALJ accorded little evidentiary weight to the opinions of Jody Strock, a certified nurse practitioner working under treating physician Dr. Armstrong, because they were "not generally consistent with the evidence taken as a whole . . . ." (R. 22–23). The ALJ gave varying levels of evidentiary weight to the opinions of the non-examining state agency medical consultants and Dr. Bacchus as they pertained to the Plaintiff's physical capabilities and impairments. (R. 26, 28.).

The Plaintiff's only past relevant work was unskilled, and based on the Plaintiff's RFC, the ALJ concluded that the Plaintiff was not capable of performing any past relevant work. (R. 28.) However, relying on the vocational expert's testimony, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*) Ultimately, the ALJ found that the Plaintiff was not disabled as defined in the Social Security Act since his alleged onset date and was not entitled to disability insurance benefits or supplemental security income. (R. 30.)

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). The Social Security Act establishes that the Commissioner's findings as to any fact are conclusive if supported by substantial evidence. *See Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Thus, the Court will affirm the Commissioner's finding of fact and denial of disability benefits if substantial evidence supports them. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2009). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Richardson*, 402 U.S. at 399–400. The reviewing court reviews the entire record; however it does not substitute its judgment

for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Diaz*, 55 F.3d at 608. The Court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal quotations omitted).

When an ALJ recommends the denial of benefits, the ALJ must first "provide a logical bridge between the evidence and [her] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citation omitted). Though the ALJ is not required to address every piece of evidence or testimony presented, "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). However, if substantial evidence supports the ALJ's determination, the decision must be affirmed even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

"An ALJ is in the best position to determine the credibility of witnesses," and a credibility determination will be overturned "only if it is patently wrong." *Craft*, 539 F.3d at 678; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.") The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *see also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements."

7

SSR 96-7p. "[T]he ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Similia*, 573 F.3d at 517 (citing 20 C.R.F. § 404.1529(c)(2)–(4) and *Prochaska*, 454 F.3d at 738). A credibility determination does not need to be flawless. *Id.* "[A] credibility determination will stand as long as there was some support in the record even if some of the ALJ's credibility determinations were a bit harsh." *Whetzel v. Astrue*, No. 1:07-CV-210, 2009 WL 537640, at *2 (N.D. Ind. Mar. 4, 2009) (citing *Berger*, 516 F.3d at 546).

## ANALYSIS

The Plaintiff argues that the ALJ erred by failing to give controlling weight to the opinions of the Plaintiff's treating physician, impermissibly "playing doctor" by interpreting medical evidence, and failing to incorporate limitations from all of the Plaintiff's medically determinable impairments into his RFC.

### A. Opinion of Treating Physician

The Plaintiff's treating physician, Dr. Armstrong, via nurse practitioner Strock, completed a residual functional capacity form, discussing limitations related to the Plaintiff's medical impairments. The Plaintiff argues that this opinion is consistent with his medical history and therefore entitled to controlling weight. The Plaintiff also argues that even if the opinion was not entitled to controlling weight, the ALJ's accordance of little evidentiary weight was "absurd." The Commissioner responds that the ALJ properly accorded little evidentiary weight to the opinion due to its inconsistency with the Plaintiff's treatment records.

Generally, controlling weight is given to the treating physician's opinion only if it is well-supported by medically acceptable, objective evidence and consistent with other substantial evidence of record. 20 C.F.R. § 404.1527(d)(2). When the treating physician's opinion is not entitled to controlling weight—such as where it is not supported by the objective medical evidence, is inconsistent with other substantial evidence in the record, or is internally inconsistent, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995))—then the ALJ should move on to assessing the value of the opinion in the same way he would any other medical evidence. *See id.* Assessing the weight to afford the opinion depends on a number of factors, such as the length, nature, and extent of the physician and claimant's treatment relationship, 20 C.F.R. § 404.1527(c)(2)(i)–(ii), whether the physician supported his or her opinions with sufficient explanations, *id.* § 404.1527(c)(3), and whether the physician specializes in the medical conditions at issue, *id.* § 404.1527(c)(5). If the ALJ discounts the physician's opinion after considering these factors, that decision stands so long as the ALJ "minimally articulate[d]" her reasons. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice v. Barnhart*, 384 F.3d 363, 372 (7th Cir. 2004)).

It is not the reviewing Court's job to determine whether the treating physician's opinion should have been given controlling weight. *See Clifford*, 227 F.3d at 869 ("[W]e review the entire record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."). However, an ALJ must give "good reasons" for the weight afforded to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). "The ALJ must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (first citing 20 C.F.R. §§ 404.1527(c)–(d);

9

then citing *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994); and then citing *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993)). "Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Id.* (first citing 20 C.F.R. § 404.1527(c); then citing *Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994)). A court on review must uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

The ALJ summarized the restrictions in Strock's opinion as follows:

> [T]he claimant can stand for 15 to 20 minutes at a time, that he can sit for 15 to 20 minutes of the time, that the claimant's impairments require him to lie down during the day, that the claimant can walk 20 to 50 feet without stopping, that the claimant can rarely reach, handle and "carefully handle," that the claimant can lift 5 to 10 pounds, and that the claimant never would be able to return to work, "with and/or without any restrictions."

(R. 22.) The ALJ "accorded little evidentiary weight to these opinions, concerning the claimant's physical residual functional capacity, because they are not generally consistent with the evidence taken as a whole, including, but not limited to, the claimant's treating medical (and other) records . . . ." (R. 23.)

The ALJ proceeded to discuss in detail the records of the Plaintiff's treatment by Dr. Armstrong and Strock as they pertained to his physical impairments. In January 2013, the Plaintiff complained of fever, cough, and sinus issues. (*Id.*) There was "some wheezing," but otherwise no rhonchi and no rales, and breathing was "unlabored." (*Id.*) Treatment was conservative, consisting of increased fluid intake and rest. (*Id.*) In February 2013, the Plaintiff complained of acute bronchitis, but reported that the symptoms were present for only about two weeks and that the symptoms were "doing a bit better." (*Id.*) His respiratory rate and pattern was normal. (*Id.*) Treatment was again conservative, consisting of a recommendation to quit smoking

10

and a prescription for Wellbutrin to help him quit smoking. (*Id.*) In July 2013, the Plaintiff complained of asthma exacerbation and reported using antihistamines, decongestants, and nasal sprays. (*Id.*) He had normal respiratory rate and pattern and no signs of respiratory distress, rales, rhonchi, wheezes, or rubs. (*Id.*) In November 2013, the Plaintiff presented at an emergency room for a hand injury after punching a wall. (*Id.*) At that time, he reported being otherwise uninjured and had no other complaints. (R. 24.) Oxygen saturation was 98% on room air. (*Id.*) In December 2013, the Plaintiff complained of COPD exacerbation, mild chest pain, wheezing, discolored sputum postnasal drip, and excessive throat clearing." Oxygen saturation was 99% on room air, and the Plaintiff had a normal respiratory rate and pattern with no signs of distress, rales, rhonchi, wheezes, or rubs. (*Id.*) The treatment plan was conservative, consisting of quitting smoking and resuming the use of nasal spray. (*Id.*)

In February 2014, the Plaintiff saw a nurse practitioner who noted that the Plaintiff's COPD was stable, that his compliance with treatment was good (other than continuing to smoke), that he was well developed, well nourished, and in no apparent distress; that respiratory rate and pattern were normal; and that there were no rales, rhonchi, wheezes or rubs. (*Id.*) The Plaintiff was advised to use a nebulizer every six hours as needed. (*Id.*) In April 2014, the Plaintiff presented to an emergency room for an eye issue. (*Id.*) At that time, oxygen saturation was 98% on room air, and he was released in good condition. (*Id.*) In August of 2014, the Plaintiff presented to an emergency room with a laceration to a finger, which occurred while he was working on a car. (*Id.*) He reported that most recently, he had otherwise been in "pretty good health." (*Id.*) Oxygen saturation was 97% on room air, and his left hand was noted to be "pretty callused from doing a lot of physical work and a little bit of chronic staining from grease, oil, etc." (*Id.*)

In July and August 2014, the Plaintiff complained of "mild and squeezing chest discomfort, dyspnea, wheezing, clear productive sputum, postnasal drip, excessive throat clearing and nasal congestion." (R. 25.) The nurse practitioner diagnosed the Plaintiff with acute sinusitis and acute exacerbation of chronic obstructive pulmonary disease. (*Id.*) His oxygen saturation was 98% on room air, and he was in no apparent distress. (*Id.*) His respiratory rate and pattern was normal and there were no rales, rhonchi, wheezes, or rubs. (*Id.*) In April 2015, on examination, the Plaintiff was in no apparent distress, and he had a normal respiratory rate and pattern. (*Id.*) The nurse practitioner noted decreased breath sounds in the right upper lung as well as diffuse expiatory wheezes and diagnosed him with acute pharyngitis. (*Id.*)

Also in April 2015, the Plaintiff underwent a consultative examination by Dr. Bacchus. (*Id.*) The Plaintiff reported chest wall pain and shortness of breath secondary to over-activity and extreme temperatures. (*Id.*) The Plaintiff did not appear to be in acute distress, and although he moved "rather slowly," he nevertheless moved "without significant difficulty." (R. 25–26). Dr. Bacchus also observed that the Plaintiff was not significantly short of breath. (R. 26.) The remainder of Dr. Bacchus's observations of the Plaintiff were "unremarkable." (*Id.*) Dr. Bacchus also noted that there was no muscle atrophy that would have been consistent with a sedentary lifestyle. (*Id.*)

In each of these instances, the ALJ noted that the complaints, the diagnoses, the medical observations, and the advised courses of treatment did not support any greater limitations that the ALJ included in the Plaintiff's RFC. Thus, the ALJ stated:

> [T]he undersigned's findings, concerning the claimants' physical residual functional capacity, is generally consistent with the evidence overall, including objective medical evidence in the form of largely unremarkable findings across multiple physical examinations and pulmonary function testing, a conservative course of medical treatment, the claimant's noncompliance with the

recommendations involving smoking cessation, and the claimant's reports of functioning, including being able to do mechanical work on an automobile.

(*Id.*) And, because the treating physician's opinion that the Plaintiff would be unable to return to work was disproportionate with the treating physician's own records, the ALJ accorded the opinion little weight.

The Court notes that, in determining that the treating physician's opinion was not generally consistent with the remainder of the record, the ALJ considered the fact that the Plaintiff continued to smoke despite numerous instructions to stop smoking. However, the Seventh Circuit has made clear that this is not an appropriate consideration unless the ALJ demonstrates that there is evidence that stopping smoking would restore the claimant's impairments to a non-severe condition. *See Shramek v. Apfel*, 226 F.3d 809, 812–13 (7th Cir. 2000) (citing *Rousey v. Heckler*, 771 F.2d 1065 (7th Cir. 1985)); *see also Childress v. Colvin*, 845 F.3d 789, 793–94 (7th Cir. 2017) (finding that "there [was] no evidence of whether on balance his smoking relieved or increased [the plaintiff's] pain, or, most important, given the gravity of his medical condition, whether stopping smoking would improve his health significantly"). However, when an ALJ's determination does not turn only on the issue of smoking, but rather "rest[s] on the weight of the evidence as a whole, including medical findings and [the claimant's] reports to his doctors," or where there is "substantial and convincing other record evidence," the ALJ's determination may not be "patently wrong." *Huggins v. Colvin*, N. 1:13-cv-1046, 2014 WL 4099353, at *7 (C.D. Ill. Aug. 19, 2014); *see also Gilber v. Comm'r of Soc. Sec.*, NO. 1:14-CV-139, 2015 WL 4470486, at *7 (N.D. Ind. July 22, 2015) (noting that, "[t]he question, then, boils down to whether the ALJ's credibility determination can stand on the ALJ's remaining . . . reasons"); *McDowell v. Astrue*, No. 1:12-cv-3519, 2013 WL 3337795, at *9 (N.D. Ill. July 2, 2013) (finding that because "the ALJ did not base his entire credibility finding

13

on [the plaintiff's] smoking history, . . . the absence of discussion about the addictiveness of smoking [was] not a particular concern of [the] Court"). Thus, the Seventh Circuit has recognized that the "ALJ's reasoning need not be perfect." *Jones v. Astrue*, No. 2:12-CV-143, 2013 WL 816170, at *13 (N.D. Ind. Mar. 4, 2013) (citing *Halsell v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009)).

In this case, the ALJ presented other reasons for discounting the treating physician's opinion in addition to the Plaintiff's failure to quit smoking. The ALJ explained why he found the opinion both inconsistent with the physician's own treating records as well as inconsistent with other evidence in the record, such as the Plaintiff's self-reporting. Thus, the Court cannot say that the ALJ's determination regarding the weight to be assigned the medical evidence was "patently wrong."

The Plaintiff also argues that the ALJ failed to appropriately explain his decision to give the treating physician's opinion little weight because he did not follow the process outlined in 20 C.F.R. 404.1527 in evaluating the treating physician's opinion. The Social Security Regulations enumerate a series of factors for the ALJ to consider:

> Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination," because the longer at treating physician has seen a claimant, and particularly if the treating physician has seen the claimant "long enough to have obtained a longitudinal picture" of the impairment, the more weight his opinion deserves; (2) the "nature and extent of the treatment relationship"; (3) "[s]upportability," i.e., whether a physician's opinion is supported by relevant evidence, such as "medical signs and laboratory findings"; (4) consistency "with the record as a whole"; and (5) whether the treating physician was a specialist in the relevant area.

*Scrogham v. Colvin*, 765 F.3d 685 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)(2)(5)). However, an ALJ is not always required to explicitly analyze each of these factors where the

"decision makes clear that [the ALJ] was aware of and considered many of the factors." *Schreiber v. Colvin*, 516 F. App'x 951, 959 (7th Cir. 2013). Rather, the "inquiry is limited to whether the ALJ sufficiently accounted for the factors . . . and built an 'accurate and logical bridge' between the evidence and his conclusion." *Id.* (citing *Elder*, 529 F.3d at 415–16 (affirming ALJ's decision where ALJ discussed only two of the factors)); *see also Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (finding that it was enough that the ALJ "note[d] the lack of medical evidence supporting [the treating physician's] opinion" and "its inconsistency with the rest of the record"); *Busking v. Colvin*, No. 11 C 1598, 2013 WL 4401380, at *15 (N.D. Ill. Aug. 14, 2013) (noting that "an ALJ is not required to undertake an in-depth analysis of each and every one of the factors set out in § 404.1527(c)(2)"). Where "the treating physicians' opinions [are] not supported by their treatment notes and [are] inconsistent with the balance of the medical evidence[,] [t]hat alone is ample reason to discount their opinions without reciting the remaining factors chapter and verse." *Busking*, 2013 WL 4401380, at *15 (citing *Henke*, 498 F. App'x at 640 n. 3). "To require more would be meaningless formality." *Id.*

In this case, despite the fact that the ALJ did not explicitly discuss each of these factors, the Court cannot say that the ALJ failed to provide "good reasons" for discounting the treating physician's opinion. Rather, the ALJ specifically explained why he found the opinion inconsistent with the other evidence in the record. The ALJ, therefore, built an accurate and logical bridge between the evidence and his conclusion.

Plaintiff also argues that the ALJ failed to consider a second treating physician "opinion" in the form of a nebulization prescription by the Plaintiff's treating physician. The Plaintiff asserts that the instructions for administering the prescription "translate[] into a limitation requiring extra breaks . . . to accommodate the nebulization schedule and it is an implicit opinion

15

that the employer must provide a clean room with privacy in which the [Plaintiff] can nebulize."
(Pl. Resp. Br. 15.) This argument is not persuasive. The Plaintiff has produced no authority that a prescription itself can qualify as a treating physician's opinion that is entitled to controlling weight.

Because the Court cannot say that the ALJ's determination regarding the weight to be assigned the medical evidence was "patently wrong," the Court cannot disturb it.

B. **Interpreting Medical Evidence**

The Plaintiff also argues that the ALJ impermissibly "played doctor" by interpreting medical evidence when he was not qualified to do so. Specifically, the Plaintiff takes issue with the fact that the ALJ determined that daily nebulizations were not necessary, arguing that there is no evidence that such frequency was medically unnecessary. According to the Plaintiff, daily nebulization requirements translate into limitations providing for unscheduled breaks and the availability of clean, private rooms. The Commissioner responds that the Plaintiff has not cited any medical evidence that would necessitate such limitations.

The ALJ is required to build an accurate and logical bridge between the evidence and his conclusions. The medication prescribed for use with the Plaintiff's nebulizer is Duoneb. The medical records submitted for the ALJ's review indicate that the Plaintiff consistently used Duoneb and reported using it up to six times per day. (R. 500.) There are also records that indicate he was instructed to take the Duoneb ever six hours. (*e.g.*, R. 455.) Although the ALJ acknowledged that the Plaintiff was prescribed nebulization treatments, the ALJ did not explain why he apparently found that that the Plaintiff did not need those treatments as often as

prescribed. As such, the ALJ did not build an accurate and logical bridge to his conclusion, and the Court cannot say that his decision was supported by substantial evidence.

**C.      Incorporation of Non-Severe Limitations into the Plaintiff's RFC**

The Plaintiff argues that the ALJ failed to incorporate limitations from all of the Plaintiff's medically determinable impairments into his RFC. Hypotheticals posed to VEs and an ALJ's RFC determination must incorporate all of the claimant's limitations that are supported by the medical record. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). The Plaintiff takes issue with the RFC determination because the ALJ failed to include limitations described in the treating physician's opinion and limitations associated with the Plaintiff's nebulizer. Moreover, the Plaintiff argues that the limitation the ALJ did include regarding dust tolerance was not strict enough and not supported by the evidence.

The ALJ is "required only to incorporate impairments into [his] hypotheticals that [he] found credible." *Rodriquez*, 2017 WL 3297781, at *7 (citing *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007) (finding that the ALJ must incorporate only "those impairment and limitations that he accepts as credible")); *see also Ehrhart v. Sec. of Health and Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992) (finding hypothetical question proper were it "reflected [the claimant's] impairments to the extent that the ALJ found them supported by evidence in the record"). As discussed above, the ALJ's rejection of limitations associated with the Plaintiff's use of the nebulizer is not supported by substantial evidence. On remand, if the ALJ determines that limitations do in fact stem from the Plaintiff's nebulization treatments, he should ensure that these limitations are appropriately communicated to the VE.

## CONCLUSION

Accordingly, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

SO ORDERED on February 9, 2018.

s/ Theresa L. Springmann<br>
CHIEF JUDGE THERESA L. SPRINGMANN<br>
UNITED STATES DISTRICT COURT